WARREN WEBSTER & CO. v. NATIONAL VACUUM STEAM HEATING CO.*

(Circuit Court of Appeals, Eighth Circuit. November 4, 1907.)

No. 2,592.

PATENTS—INFRINGEMENT—STEAM-HEATING APPARATUS.

The Donnelly patent, No. 670,893, for an improvement in steam-heating apparatus, consisting of a water valve for automatically controlling the discharge of the air and water of condensation from the radiators, which valve is operated by the difference in steam pressure between the inlet and outlet side, *held* not infringed by a device operated by a float actuated by hydrostatic pressure alone.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

Ernest Howard Hunter (Joseph G. Holliday, on the brief), for appellant.

Emil Starek and Jacob Klein (Klein & Hough, on the brief), for appellee.

Before VAN DEVANTER, Circuit Judge, and RINER, District Judge.

RINER, District Judge. This is an appeal from a final decree entered by the Circuit Court for the Eastern Division of the Eastern District of Missouri, dismissing a bill in equity brought for the alleged infringement of claims 2 and 7 of letters patent, No. 670,893, issued to James A. Donnelly March 26, 1901, for an improvement in steam-heating apparatus, and relating particularly to a motor valve in the type of steam-heating apparatus known as the "Vacuum system." The character of the invention is described by the patentee in his specifications as follows:

"It is an object of my invention to render a steam-heating system automatic in the regulation of the outlet-valves which control the discharge of the air and water of condensation from the heaters, coils, or other radiating devices.

"In carrying out my invention I employ a valve-actuating device operated by the difference in pressure in the return or outlet side and in the radiator or inlet side and means controlled by the conditions on the inlet side, such as the pressure or the presence of steam or water, to control the differential pressure acting on the valve-actuating device. Thus while the operation of the valve is effected by means of the differential pressure that differential pressure and the operation of the valve are regulated and controlled by the conditions existing on the inlet side, so that the valve passageway will be opened or closed to a greater or less extent, as the existing conditions on the inlet side may require, and a very regular and certain operation is obtained.

"In the preferred embodiment of my invention, as shown in the drawings, the means for actuating the valve consist of a pressure-motor communicating with the return or outlet side. By employing as the pressure-motor a flexible diaphragm having one side subjected to the pressure or conditions on the inlet side communicating with the radiating devices and the other side subjected to the pressure or conditions on the outlet side communicating with the return I am able to control the operation of the outlet-valve operated by said diaphragm by the relation between the pressures in the radiator and return. If the outlet-valves remain constantly open to an extent necessary to effect the discharge of the water of condensation, there is liability of 'short-circuiting' and waste of steam, and this is particularly the case in those systems in which

---

*Rehearing denied January 6, 1908.

a partial vacuum or lower pressure is created in the returns for the purpose of drawing out the air and water.

"It is also an object of my invention to render the valves automatic, so that they will open or close, according to the conditions existing in the radiating devices or returns at which they are located, thus enabling the water of condensation and air to be fully discharged, but preventing the waste of steam. This result has been accomplished heretofore by the use of thermostatic valves and steam-traps, which remain open to permit the air and water to escape, but close to the passage of steam; but it is an object of my invention to accomplish this automatic regulation without the use of thermostatic devices for that purpose.

"The preferred means for controlling the operation of the pressure-motor consists of a float controlled by the water of condensation on the inlet side and controlling a vent in the pressure-motor, by which the differential pressure and the operation of the motor are regulated."

The following drawing, with the explanation thereof, taken from the specifications, shows quite clearly the means by which the pressure-motor in this invention is operated:

Fig. 1

"To control the operation of the motor by the conditions existing on the inlet side, I provide a vent, l, leading into the motor chamber, h, from the inlet side, through which the air may be drawn out from the radiator while the valve, d, is closed. This vent is of larger area than the duct, j, so that the air will not be exhausted from the motor chamber, h, faster than it can enter through the vent. It consequently follows that while the vent, l, is open it forms an intercommunication between the opposite sides of the diaphragm, and the pressures on the opposite sides will be equal and there will be no movement of the diaphragm or valve, d. When, however, the vent, l, is closed and the pressure in the chamber, h, is reduced, the pressure on the inlet side will lift the diaphragm and open the valve. This vent, l, may be controlled by the conditions existing on the inlet side; but as the accumulation of water of condensation is the condition which is of chief importance, I prefer to control the vent, l, automatically by the water of condensation. For this purpose I employ a float, m, arranged within the inlet side and adapted, when acted upon by the accumulation of water in the valve, to close the vent. In the construction shown in Fig. 1, the float, m, rests upon the valve-piece and embraces the tube, i. It carries a valve, n, adapted when the float is lifted to close upon the vent, l. A pin, o, projecting from the valve, n, serves to hold the float in alignment and guide the valve and also to keep the vent free and unobstructed by the particles of foreign matter.

"Besides the particular devices shown, other means may be employed for controlling the operation of the motor, e, and valve, d, under the action of the partial vacuum or conditions existing on the outlet side or return.

"While I have shown my invention embodied in a system in which a partial vacuum or lower pressure is created in the returns by means of an exhausting device connected therewith, the invention may also be embodied in a pressure system in which such exhausting device is not employed. In either case the operation of the valve-actuating motor will be operated by the difference in pressure in the returns and in the inlet side or radiator, while that difference in pressure will be controlled by the devices controlled by the conditions existing in the inlet side."

The claims of this patent which are said to be infringed are numbered 2 and 7, and are in the following words:

"2. In an automatic valve device for steam heating systems, the combination of a valve-body having a valve seat, a valve-piece to control said valve-seat, a pressure-motor controlling said valve-piece located within the said valve-body between the inlet and valve-seat, and having one side subjected to the pressure on the inlet side of the valve-body, and the other side subjected to the pressure on the outlet side beyond the valve-seat, and means controlled by the conditions on the inlet side of the valve to automatically control the pressure acting on the valve-motor from the side in communication with the outlet side of the valve-body beyond the valve-seat, whereby the differential pressure acting upon said pressure-motor to operate the valve-piece is controlled by the conditions existing on the inlet side of the valve-body."

"7. In an automatic valve device for steam heating systems, the combination of a valve-body having a thoroughfare, a valve-piece to control said thoroughfare, a pressure-motor for controlling said valve-piece having its opposite sides directly and constantly exposed to the pressure on the inlet and outlet sides of the valve-body respectively and adapted to be operated by the difference in said pressures, and means controlled by the conditions on the inlet side to automatically control the difference in said pressures and the operation of the motor and valve piece thereby."

The defendant claims to be operating under two patents issued to James R. Wade, dated October 16, 1900, and April 22, 1902, respectively. The patents are numbered 659,776 and 698,083 (the latter patent being a division of the former). It is contended by the defendant that the valve of the Wade patent is in no sense a pressure-motor, but, on the contrary, is a float, and operates hydrostatically by flotation. Its nature, construction, and mode of operation, as insisted by the defend-

ant, is shown in the following drawings and description thereof, taken from the specifications and claims found in the patent:

"Referring to the drawings, R represents a radiator of any heating system, to which leads a steam-supply pipe 1 and from which leads the delivery pipe, 2. Interposed at the discharge end of the radiator, between the latter and the pipe, 2, is my attachment or valve. The latter comprises an outer valve-casing, 3, to the upper open end of which is secured a screw-cap, 4, from the center of the inner face of whose top depends a guide-tube, 5, designated to receive the central tubular stem, 6, of a cup or float, 7, adapted to be normally seated about the edge of the opening, 8, formed at the bottom of the casing. The bottom of the hollow stem is provided with an opening, 9, for the free passage of the currents, as seen by arrows in Fig. 2.

"Under ordinary circumstances the water of condensation incidental to the operation of the system will mechanically lodge and in a short time fill the cup up to the lower edge of the tube, 5, the water in the casing corresponding to the same level. The condensation-water by thus filling the cup to the lower edge of the tube, 5, acts as a seal against a too-violent draining of the radiator under the action of the vacuum-generator (not shown) to which the pipe, 2, leads, it being understood that the said condensation water is maintained at this level

in the cup, any excess being carried off mechanically by the currents induced as a result of the vacuum or rarefaction referred to. The water thus carried off passes from the radiator into the cup, thence upward through the space between the stem, 6, and guide-tube, 5, and thence down through the stem, 6, and opening, 9, into the pipe, 2. Should the condensation take place more rapidly than the currents could carry off the same mechanically, the water which would thus accumulate around the cup would raise the latter off its seat, permitting the water to discharge through the opening, 8, into the pipe, 2.

"It is to be understood that the present device may be applied to any vacuum-heating system similar to that set forth in the aforesaid patent.

"A review of the foregoing discloses the fact that the openings, 8 and 9, both communicate with the common outlet for the casing, that the opening 9 is located in the path of the opening 8 and registers with it, and that the opening 9 is always open to the pipe 2 and to the radiator, R.

"Having described my invention, what I claim is:

"1. A radiator attachment comprising a casing having a suitable inlet-opening, an inner tube depending from the top of the casing, an outlet-opening at the base of the casing located below the tube, an exit-pipe in communication with said outlet-opening, a cup or float surrounding the tube and adapted to seat over the opening at the base of the casing, a tubular stem open at both ends carried by the float and located within the tube and spaced therefrom, thereby affording communication by the passage thus formed, between the radiator and the exit-pipe, substantially as set forth.

"2. A radiator attachment comprising a casing having a suitable inlet-opening, a screw-cap covering the top of the casing, an inner tube depending from the center of the cap, an outlet opening at the base of the casing located below the tube, an exit-pipe in communication with said outlet-opening, a cup or float surrounding the tube and adapted to seat over the opening at the base of the casing, a tubular stem open at both ends carried by the float and located within the tube, and spaced therefrom, thereby affording communication by the passage thus formed, between the radiator and the exit-pipe, substantially as set forth."

It is not contended here that the valve described in the Wade patent is an infringement upon the complainant's device. It is insisted, however, that the defendant has made additions in the Wade valve which entirely change its character, and that these changes convert the cup in defendant's valve into a pressure-motor. The valve complained of is shown in the following drawing:

It will be seen by comparing it with the drawing in the Wade patent that the changes consist in the additions of the depending wall, 10, on the cap and the extension of the rim of the cup, 12, within that wall and form the annular space, 13.

The conditions which must exist on the inlet side of the valve in complainant's patent to effect the necessary differential pressure by which the pressure-motor is moved to raise the valve piece are "the pressure or the presence of steam or water." Either of these conditions will result in a working differential. The condition, however, which is of chief importance and which is responsible for the differential under which the motor responds, is the accumulation of water of condensation on the inlet side of the valve. When such a condition obtains, the vent of the motor by such condition is controlled through the instrumentality of the float, m, shown on the drawing, or its equivalent.

This float consists of one of the devices controlled by the conditions existing in the inlet side of the valve, or, in the language of the patentee:

"The operation of the valve-actuating-motor will be operated by the difference in pressure in the returns and in the inlet side or radiator, while that difference in pressure will be controlled by the devices controlled by the conditions existing in the inlet side."

It will thus be seen that the device which is controlled by the conditions on the inlet side of the valve is the float, m, indicated on the drawing, and the means controlled by the conditions referred to in claims 2 and 7 of the patent being sued for refer to the float or any other means which, acting under the influence of the conditions on the inlet side, will secure the effective sealing of the vent to enable the pressure-motor to lift the valve piece. In other words, when the vent, l, is closed by the valve on the float so that all communication between opposite sides of the motor are cut off, it allows an increase of the steam pressure to accumulate below the motor in excess of the pressure above, and this excess or differential serves to move the motor and raises the valve piece, marked "d" on the drawing. It will be noticed that this motor, or diaphragm, is "actuated by steam pressure," and that the only function performed by the water is to control the float, or equivalent device, by which, in turn, "the difference in pressure will be controlled." In the defendant's patent the patentee's conception of his invention undoubtedly was that his cup was a float; and in this we think he was right. However that may be, we do not see upon what theory it can be said that this patent infringes complainant's patent, for as was said by the Supreme Court in Stow v. Chicago, 104 U. S. 547, 26 L. Ed. 816:

"A patentee who is the first to make an invention is entitled to his claim for all the uses and advantages which belong to it."

And it was further said in that case that it was immaterial whether he perceived and stated such advantages in his patent. But, in the view we have taken of this case, it is not necessary to consider that question.

It is contended by the complainant that the valve described in the Wade patent was purely a float valve and operated hydrostatically by flotation alone, and as such was inoperative in a vacuum system be-

cause of the suction in the return which prevented it from floating; that the defendant then made the changes complained of, and thereby changed the valve from a float to a pressure-motor. And, in support of this contention, some of the witnesses for complainant testified that, when steam is admitted to the radiator through the inlet pipe, the air passes out of the radiator and into the valve. As the air passes out, the steam is allowed to enter. The air passes into the body of the valve through the inlet, and then between the inside of the body of the valve and the outside of the cup up through the small space between the upper part of the cup and the lower part of the cap, then downward into the cup and upward between the outside of the tube 6 shown on the drawing and the inside of the tube 5. The air then passes down through the inside of the tubular stem, 6, and out through the orifice, 9, into the return pipe. As the air passes out, the steam continues to enter, and the air passes out and the steam enters, because the pressure in the return pipe is less than the pressure of the steam in the supply pipe. There is less pressure in the return pipe than there is in the supply pipe. After a certain amount of steam has entered the radiator, the steam commences to condense, and the water, due to condensation, falls to the bottom of the radiator and flows towards the valve on the outlet end of the radiator; as the water accumulates in the body of the valve it accumulates around the cup, until finally the water rises and closes the small space between the upper part of the cup and lower part of the cap, and thereby cuts off communication between the interior of the valve-body above the cup and the space between the valve-body outside of the cup and communicating with the inlet side of the valve-body. When this sealing action takes place, the suction from the returns, acting through the small aperture in the valve piece, reduces the pressure on the upper or inner side of the cup, or float, relatively to the pressure which exists outside of the cup and in the body portion of the valve casing on the inlet side. The action of this is to produce an effective differential in pressure to act upon the cup, there being a less pressure on the inside than upon the outside, with the result that the cup, or float, is forced to rise and carry with it the valve piece to permit a free discharge of the water of condensation from the body into the valve orifice, 8, shown on the drawing, into the returns. This operation, it is contended, results in the discharge of the water of condensation, and breaks the water seal between the upper part of the cup and the lower part of the cap, and permits the cup to descend to its seat. We cannot accept this theory; for the word "sealed," as here used, can mean nothing more than that the water flows into the space around the cup until it reaches the space between the upper part of the cup and the lower part of the cap, and it can hardly be said that water seals an opening against the passage of water itself, or as Prof. Woodward, in his testimony, puts it:

"The very entrance of the water into that space shows that the water can enter the space, and therefore the opening is not sealed; so I regard the use of the word 'sealing,' at that point, with reference to the filling of that space, whether the space be large or small, as inappropriate and improper."

When the water of condensation rises above the top of the inlet pipe, the inlet pipe may properly be said to be sealed, because the steam

in the radiator cannot then enter the casing of the valve. In other words, the water closes the opening against the passage of steam. In the complainant's patent the sealing takes place, not only when the inlet pipe is wholly under water, but the passageway through the diaphragm is sealed by a valve. The difference is we think manifest. The sealing which takes place in complainant's valve and causes it to operate as a motor is when the vent is closed by the valve on the float, and this can never take place in the defendant's valve either in the form shown in the drawing of the valve complained of, or in any form of defendant's valve offered in evidence. In all of defendant's valves only one kind of sealing takes place, and that is when the water of condensation rises above the top of the inlet pipe. It follows, therefore, as it seems to us, that this water performs but one function and one object—that is, to float the cup—and that it cannot be said that the cup in defendant's valve is in any sense the equivalent of the complainant's valve. In complainant's valve the vent can never be omitted, for without it the device would become inoperative, the vent being a part of the pressure-motor, so that whatever be the means controlled by the conditions these means must be either the float or some equivalent of the float. Fay v. Cordesman, 109 U. S. 408, 3 Sup. Ct. 236, 27 L. Ed. 979. As stated by the patentee:

"The preferred means for controlling the operation of the pressure-motor consists of a float controlled by the water of condensation on the inlet side and controlling a vent in the pressure-motor, by which the differential pressure and the operation of the motor are regulated."

It is undoubtedly true that if any considerable vacuum existed in the discharge pipe immediately below the opening, 8, shown on the drawing, that the cup in defendant's device would not rise, but there is testimony in the case to the effect that there was almost continuously a steam jet escaping through the orifice, 9, as indicated on the drawing, and that the pressure from this steam jet at the point of impact, reacting from the walls of the discharge pipe, increased the pressure in such a way that the cup would lift with slight assistance from the water surrounding the cup in the body of the valve. Prof. Woodward testifies from actual experiment that the cup did operate between the steam pressures in the radiator on one side and the vacuum pipe on the other, and that the cup operated irrespective of the diameter of the cup and irrespective of the fact that it did or did not reach the flange, 10, connected with the cap, shown in the drawing. If this theory be correct, then the relations between the steam pressures in the radiator, the pressure within and above the cup and the pressure in the outlet pipe are not important, since the cup operates, not by reason of them, but in spite of them, and whatever these pressures may be, it would not take away the cup's capacity to float. Neither is it important for us to determine how much the pressure within and above the cup may be less than the pressure of the steam in the radiator, because to the extent that it is less it becomes supplemented by the hydrostatic head around the cup, so that this head, together with the pressure within and above the cup, would always balance the steam pressure in the radiator; otherwise, the water would run over the edge of the cup and sink it. These forces being equalized, nothing further remains except

the action of the congestion below the cup to offset the excess pressure within and above the cup from the pressure in the outlet pipe immediately over the section of the cup serving as a valve piece. There must, of course, at all times, be a free communication between the inlet and outlet in the defendant's device, so as to create a constant jet at the point of outlet, 9, shown on the drawing, for it is this constancy in the escape of steam that is indispensable to the operation of the cup. There exists, then, this difference between the two devices: In the complainant's patent the constant escape of steam would render the same inoperative; whereas, in the defendant's device, the constant escape of steam is necessary to its operation. Hence we do not think it can fairly be said that the cup in the defendant's valve is analogous to the diaphragm or motor in complainant's valve. It is so radically different both in construction and theory of operation that it does not justify the comparison sought to be made by the complainant. The defendant's valve has a single moving piece which operates by floating. It operates, not in direct consequence of the difference between two steam pressures, but by hydrostatic pressure alone; whereas, the complainant's diaphragm or motor moves, not in consequence of any hydrostatic pressure, but in consequence of a difference between two steam pressures.

The decree of the Circuit Court dismissing the bill is affirmed.